G. Raymond **MILLER**, Appellant,

v.

Clarence F. **KENDALL II**, Appellee.

No. 01–89–01028–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 25, 1990.

Rehearing Overruled Jan. 17, 1991.

935

Stanley Binion, J. Robin Lindley, Houston, for appellant.

Ben L. Krage, Andrew F. Spalding, Martin J. Sweeney, Houston, for appellee.

Before SAM BASS, HUGHES and PRICE [1], JJ.

1. The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

## OPINION

PRICE, Justice.

G. Raymond Miller appeals a judgment awarding his former partner, Clarence F. Kendall II, $2,854,801 for Miller's alleged breach of fiduciary duty. Kendall cross-appeals, seeking greater damages and an award of prejudgment interest. We affirm the trial court's judgment.

Miller, an entrepreneur, and Kendall, an attorney, have collaborated on several business ventures, including K & M Partnership (K & M). K & M was formed in 1983 to purchase a Stratus 32 Fault–Tolerant Computer, related equipment, and software. K & M leased the computer to Automated Radius Management, Inc. (ARM), another business formed by Miller and Kendall. The parties agree that the ARM venture was a failure.

In 1985, Miller incorporated United Payphones, Inc. (UPI). UPI, unlike K & M, was not a joint venture between Miller and Kendall. Miller and Kendall agreed that K & M would lease its Stratus computer to Miller's new business. Each testified that they agreed to evenly divide the consideration UPI gave for the Stratus computer. UPI issued 100,000 shares of common stock in the fall of 1985. Miller received 62,125 shares, Kendall received 12,250, and five other individuals received the remaining stock. The parties dispute why Miller received more shares than Kendall.

Kendall claims that UPI issued Miller 62,125 shares solely as consideration for the Stratus computer lease. UPI's corporate records support Kendall's claim. A "Unanimous Consent of Directors In Lieu of the Organizational Meeting of the Directors of United Payphones, Inc.," dated March 19, 1985 (hereinafter the "Directors' Consent"), states:

## ISSUANCE OF STOCK

RESOLVED, that the Corporation shall initially issue 74,375 shares of its common stock for a consideration of $1.00 each as follows:

| Shareholder | Number of Shares | Value |
|---|---|---|
| G. Ray Miller | 62,125 | $62,125 |
| Clarence F. Kendall, II | 12,250 | $12,250 |

FURTHER RESOLVED, that the Corporation attribute as consideration for such 74,375 shares of its common stock, the value of the Equipment Lease, whereby the Corporation will lease from K and M Partnership, a Texas General Partnership composed of C.F. Kendall, II and G. Ray Miller, one certain Stratus/32 Fault Tolerant Computer System and related Central Control Center Fixtures....

Miller signed the Directors' Consent as the sole director of UPI in March 1985.

Kendall testified that he did not discover the contents of the Directors' Consent until June 1987. Until then, he believed that both he and Miller had received 12,250 shares of UPI stock in return for the Stratus computer lease. Kendall contends that Miller breached the fiduciary duties he owed him, as his partner, by taking a disproportionate number of shares.

Miller acknowledges that he received 62,-125 shares. He contends, however, that most of the shares were issued in return for consideration other than the computer lease. He testified, for example, that he loaned UPI substantial sums of money and worked without salary during UPI's startup period. He testified that the Directors' Consent mistakenly recited that the stock issued Miller was only for the computer lease.

Miller offered conflicting testimony regarding the alleged mistake. The attorney who drafted the Directors' Consent, James Panipinto, testified that he followed the directions of either Michael Ginsberg, a partner in his law firm, or of Beth Morris, an employee of UPI. Morris and Ginsberg disagreed with Panipinto's testimony. Beth Morris testified she knew the document was mistaken when she first saw it, and that she told Miller and UPI's lawyer, Michael Ginsberg, of the mistake. To the best of her knowledge, Ginsberg did not correct the mistake after she brought it to his attention. Ginsberg testified he did not recall discussing the mistake with Beth

Morris, and that he did not learn of it before Kendall sued Miller. Miller testified he did not know of the alleged mistake until Kendall sued him.

Bruce Turbow, a former UPI employee, testified by deposition that he drafted several proposals for the distribution of stock for Miller's approval. When asked what the justification was for Miller's receiving 62,125 shares of UPI stock, Turbow concluded: "That's because he was chairman of the board, chief executive officer and the president and the person funding the company, he could do what he wanted. There [were] no agreements or no definitions explaining why he got that quantity of shares."

Charlotte Curtis, UPI's accountant, testified that she kept the corporation's books during its formation. Her records showed that Miller received some of his additional shares of stock in exchange for his forgiveness of $80,000 in accrued salary and $200,-765.07 in promissory notes payable by UPI to him. Her accounting records also showed that Miller received 20,650 shares as founders' stock. Curtis admitted that some of her records were created after December 31, 1985, in order to "back up" transactions that appeared on the UPI balance sheet of that date, but had not been recorded earlier.

UPI eventually changed its name to International Telecharge, Inc. (ITI), merged with another company to form International Telecharge, Inc., Delaware, and exchanged its stock in a 40–to–1 split. After the split, Miller held 2,485,000 shares of ITI Delaware stock; Kendall, 490,000 shares. Because Kendall asserts an entitlement to 50% of the original UPI shares allegedly issued for the computer lease, he contends that he is owed an additional 997,500 shares of the new stock, which was publicly traded on the American Stock Exchange at the time of trial.

The case was submitted to a jury. In response to questions, the jury answered "no" when asked if Miller's conduct in the transaction involving the exchange of the Stratus computer for UPI stock was fair to Kendall. The jury found that Kendall "should have been issued" 18,594 shares of UPI stock. The jury further found that the value of one share of the ITI Delaware stock that Kendall should have received was $11.25, and that Kendall was entitled to $1.00 in punitive damages. After denying motions for judgment notwithstanding the verdict filed by both sides, the trial court rendered a judgment of $2,854,801 in Kendall's favor. For reasons detailed by the trial court in a "memorandum and opinion," dated July 7, 1989, Kendall's request for prejudgment interest was denied.

Miller raises 26 points of error. Nine of them relate to the first jury question and its accompanying instruction, which asked:

Do you find that the conduct of G. Ray Miller in the transaction involving the exchange of the Stratus computer (by sale or lease) for the shares of stock in UPI was fair to C.F. Kendall, or C.F. Kendall's partnership interest in K & M?

In determining whether one party was "fair" to another, you are instructed to consider the fiduciary relationship between the parties. Each partner in a partnership is in a fiduciary relationship, one to another. Each must act fairly, honestly, and make disclosure of all material information to the partnership and partners. A fiduciary is obligated to serve the partnership and other partners' interest with undivided loyalty and in the utmost good faith. If one of the parties to the relationship obtains an advantage over the other, an unfairness may arise. That party has an obligation to demonstrate that the transaction was fair.

The jury answered "no." Miller contends that the submission of the jury question was not supported by the evidence, that the jury question was formally defective, and that the jury's answer was not supported by factually and legally sufficient evidence.

■ We first address Miller's challenges to the form of jury question one. In his first point of error, Miller complains that question one did not submit "the proper controlling question of fact." Miller argues that question one allowed the jury to "do mischief and to answer the question in

Kendall's favor for any number of irrelevant reasons."

Miller's complaint on appeal is broader than his objections at trial. At trial, Miller made the following objection:

> The term "conduct of G. Ray Miller in the transaction" does not ask a question that can give rise to a recovery in favor of Plaintiff because all that Miller is required to do is to demonstrate if the burden had been met that the transaction resulted in fairness to Mr. Kendall. Inquiring as to whether or not Mr. Miller's conduct was fair allows the jury to answer the question based upon conduct irrelevant to this case.

Consequently, the only argument Miller preserved for appeal was his complaint that his "conduct" was irrelevant to the case. Appellate complaints regarding the submission of a jury question are waived unless raised by a specific objection in the trial court. TEX.R.CIV.P. 274. We therefore construe Miller's point of error to mean that the issue of his conduct was not a controlling question of fact.

■ A trial court has considerable discretion in submitting jury questions, *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 256 (Tex.1974), subject to the requirement that the submitted questions and their instructions must fairly submit the disputed issues for the jury's determination, *Baker Marine Corp. v. Moseley*, 645 S.W.2d 486, 489 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). The trial court is directed to submit the cause upon broad-form questions whenever feasible, with "such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX.R.CIV.P. 277. "A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question." TEX.R. CIV.P. 278.

■ Miller cites no authority for this argument. Each person entering a partnership "consents, as a matter of law, to have his conduct towards the other measured by the standards of the finer loyalties exacted by courts of equity." *Johnson v. Peckham*, 132 Tex. 148, 152, 120 S.W.2d 786, 788 (1938). Despite Miller's protests to the contrary, the controlling issue here was whether his conduct towards Kendall was fair. In view of its mandate to submit broad-form questions, the trial court did not err by submitting question one. We overrule the first point of error.

■ In his second point of error, Miller contends that the trial court should have submitted his requested jury question instead, which asked whether he and Kendall in fact received equal amounts of UPI stock for the Stratus computer. Miller cites no authority supporting his claim that the trial court abused its discretion in refusing his proposed question, although he alludes to the possibility that there was a variance between the pleadings and the evidence. Even before the amendment to rule 277 mandated broad-form submission, the supreme court noted that such a variance does not present reversible error unless it is substantial, misleading, constitutes surprise, and is a prejudicial departure from the pleadings. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 937 (Tex.1980). Miller has failed to specifically show such a variance either in the trial court or on appeal, by referring to the pages in our record where such a variance may be found. He has waived any error. *Id.* at 938; TEX.R.APP.P. 74(f). We overrule Miller's second point of error.

■ In points four and five, Miller complains that there was no evidentiary basis for the submission of question one. The rules direct the trial court to submit jury questions "raised by the evidence." TEX.R. CIV.P. 278. We therefore review the record to determine whether there was legally sufficient evidence supporting question one's submission. *See Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex.1965) (trial court may not refuse submission of special issue raised by legally sufficient evidence).

In his fourth point of error, Miller argues that the evidence conclusively established that he was not acting in a fiduciary capacity in connection with UPI's stock issuance. The relationship between partners is fiduciary in nature, and the mere dissolution of

the partnership does not relieve the partners of their fiduciary obligations to one another. *See* TEX.REV.CIV.STAT.ANN. art. 6132b, § 21(1) (Vernon 1970). Miller has cited no authority for his contention that "[s]imply because Miller was Kendall's partner in K & M does not impose upon Miller fiduciary duties to Kendall when acting as director of UPI." On the contrary, article 6132b, section 21(1), holds every partner accountable for "any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property." We overrule Miller's fourth point of error.

In his fifth point, Miller contends that he was not liable in the capacity in which he was sued, i.e., as a UPI director rather than as Kendall's partner. He asserts that the UPI board of directors decided how the initial stock would be divided, and that his input into the decision was not made in his fiduciary capacity as Kendall's partner in K & M. Therefore, he contends, the first jury question improperly cast him as Kendall's fiduciary with respect to the distribution of stock.

■ Miller's contention that the corporation, not he, decided the distribution of shares was countered by his former employee, Bruce Turbow, who testified that the final decision was Miller's alone. A withdrawing partner cannot avoid his fiduciary duties by using a corporate entity he controls to purchase partnership property. *See Kunz v. Huddleston*, 546 S.W.2d 685, 689 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.) (withdrawing partner whose corporation purchased partnership note was liable for breach of fiduciary duty). Point of error five is overruled.

■ In his third point of error, Miller argues that question one improperly placed the burden of proof on him. When a fiduciary relationship is pleaded and proved, the burden of proving the fairness of a transaction between the parties shifts from the plaintiff to the defendant. *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex.1980). Miller does not disagree

with this proposition, but denies that Kendall proved the existence of a fiduciary relationship. Because we have overruled those contentions, raised in points four and five, we also overrule point of error three.

■ Miller next challenges, in points of error six, seven, eight, and 21, the legal and factual sufficiency of the evidence supporting the jury's negative answer to question one. In reviewing legal insufficiency points, we consider only the evidence tending to support the finding, viewing it in the light most favorable to the verdict, giving effect to all reasonable inferences that may properly be drawn from the evidence, and disregarding all conflicting evidence. *Garza*, 395 S.W.2d at 823. In reviewing factual insufficiency points, we must consider all the evidence in the case to determine if the jury's finding is so against the great weight and preponderance of the evidence that its verdict was manifestly unjust. *In re King's Estate*, 150 Tex. 662, 665, 244 S.W.2d 660, 661 (1951). The jury is the sole judge of the credibility of the witnesses and the weight of their testimony, and is free to believe or disbelieve that testimony in whole or in part. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.— Houston [1st Dist.] 1984, writ ref'd n.r.e.).

■ Miller contends that the "uncontroverted" evidence that the Directors' Consent was a mistake conclusively established that Kendall was treated fairly. Miller cites no authority for his argument that the evidence conclusively established that the Directors' Consent was a mistake. He concedes in his reply brief that corporate records are prima facie evidence of the facts stated therein, citing *Pickett v. Abney*, 84 Tex. 645, 19 S.W. 859 (1892), and *McIlhenny v. Binz*, 80 Tex. 1, 13 S.W. 655 (1890). Nevertheless, he argues that "it makes sense that a mistaken factual recitation is not competent evidence of the fact mistakenly recited." Miller admits that no court has ever adopted such a rule, and we refuse to be the first to decide that a document does not constitute competent evidence of its contents. Accordingly, we overrule Miller's challenges to the legal sufficiency of the evidence supporting the

jury's answer to question one. Points of error six, eight, and 21 are overruled.

Neither do we find the evidence factually insufficient to support the jury's "no" answer. Miller's own witnesses, as we detailed at the outset, conflicted in explaining how the Directors' Consent originated and who was responsible for its language. Miller's former employee, Bruce Turbow, stated that Miller "could do what he wanted" in distributing stock. In light of the quantity of evidence produced on both sides of the dispute, we do not find the jury's answer to question one to have been against the great weight and preponderance of the evidence, nor that the verdict was manifestly unjust. Point of error seven is overruled.

Miller next complains, in points of error nine through 12, that the evidence was factually and legally insufficient to support the jury's answer to the second jury question: "Of the original 74,735 shares of UPI stock, state the number of shares of UPI stock which should have been issued to C.F. Kendall or C.F. Kendall's partnership interest in K and M for the Stratus computer." Miller argues that the jury's answer should have been 12,250 shares.

Kendall also attacks the jury's answer to question two, in two cross-points of error. In his first cross-point, he contends that the Directors' Consent conclusively established that he should have received 37,187.5 shares. Alternatively, in his second cross-point, he urges that the jury's answer to question two was immaterial and should have been disregarded by the trial court.

In challenging question two, Miller repeats his arguments that his evidence conclusively established that the Directors' Consent was mistaken, and that Kendall was entitled to only 12,500 shares. We have already rejected those arguments. Miller also contends that Kendall's pleadings support a recovery of the present value of 37,187.5 shares and no less. He argues that the jury "split the baby" by awarding Kendall approximately half of the shares he sought.

Interestingly, Kendall agrees that the jury's award of 18,594 shares, though Solo-

monic, was not supported by competent evidence. Kendall argues that the Directors' Consent conclusively established that 74,375 shares were issued for the computer, and that he was entitled to not fewer than half those shares, pursuant to his agreement with Miller. He cites TEX.BUS. CORP.ACT ANN. art. 2.16(C) (Vernon 1980): "In the absence of fraud in the transaction, the judgment of the board of directors or the shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive." Kendall contends that article 2.16(C) operates as a parol evidence rule barring Miller's extrinsic evidence of the alleged mistake in the Directors' Consent. He argues that the trial court erred in denying his motions challenging the jury's answer.

In response, Miller argues that article 2.16(C) is not a parol evidence rule. He contends that article 2.16(C) serves another purpose: to protect corporate directors from liability if their valuation of the consideration received for shares is higher than its fair value, so long as the directors act in good faith. *See* TEX.BUS.CORP.ACT ANN. art. 2.16 comment (Vernon 1980).

When a writing is intended as a completed memorial of a legal transaction, the parol evidence rule excludes other evidence of any prior or contemporaneous expressions of the parties relating to that transaction. *Muhm v. Davis*, 580 S.W.2d 98, 101 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). The rule applies only to operative legal transactions and not, for example, to recitals of past consideration received. *Id.* Corporate records, unlike contracts, are not operative legal transactions; corporate acts may be shown by extrinsic evidence other than the records. *Fort Worth Publishing Co. v. Hitson*, 80 Tex. 216, 229, 14 S.W. 843, 846–47 (1890); *Canadian Long Distance Tele. Co. v. Seiber*, 159 S.W. 897, 903 (Tex. Civ.App.—Amarillo 1913, writ ref'd n.r.e.). This rule is reflected in the Business Corporation Act, which requires each corporation to "keep minutes of the proceedings of its shareholders, its board of directors, and each committee of its board of di-

rectors...." Tex.Bus.Corp.Act Ann. art. 2.44(A) (Vernon Supp.1990). Article 2.44(A) does not state that a corporation's records constitute its acts. We do not read Article 2.16, which refers to the directors' act in valuating consideration for stock, as a parol evidence rule that bars the admission of evidence that the corporation's record of that act is mistaken. Accordingly, Miller's evidence of such a mistake was admissible.

■ We thus reject Miller's argument that the evidence conclusively established the answer to question three was 12,250; we also reject Kendall's contention that the answer could only be 37,187.5. We now face the task of determining whether the evidence supports the jury's answer of 18,-594. We receive no help from either party. Although each asserts that there is no evidence in the record supporting the jury's answer to question two, neither maintains its points of error by "viewing the evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding." Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.R. 381, 364 (1960). Without a sufficient discussion of the record, neither party can maintain its points of error. Tex. R.App.P. 74(f).

We are not obligated to search the record for error, but our review of the documentary evidence reveals some support for the jury's answer to question two. Bruce Turbow's notes indicate that Miller considered a variety of formulations that would have provided the K & M partnership anywhere from 10,000 to 86,667 shares. Charlotte Curtis and Miller testified that UPI's issuance of stock was calculated by giving Miller stock in exchange for his forgiveness of $80,000 in accrued salary and thousands of dollars in promissory notes. Miller admitted that $80,000 was a value that he placed on his services. The value of the forgiven promissory notes was disputed.

Based on the evidence, the jury could have reasonably found that (1) Miller arbitrarily assessed the value of Kendall's interest in the computer at 12,250 shares; (2) Miller was entitled to some additional consideration for services and cash contributions, but that his total distribution of 62,-125 shares was excessive; and (3) each party should have received 18,594 shares for the computer, but Miller should have drawn only 37,187 additional shares, not 62,125, for any additional consideration. Such a finding is consistent with Turbow's testimony that Miller could "do what he wanted" with regard to the distribution of shares. It is also consistent with Kendall's pleading that Miller disproportionately issued himself more shares than he had promised Kendall he would.

In its memorandum and opinion, the trial court stated that the "jury apparently believed that both plaintiff and defendant should have been issued 18,594 shares for their respective interest in the computer by and through the 'unsettled' K and M Partnership." As our survey of the record indicates, there is some support in the evidence for such a finding. The jury is uniquely qualified to determine the amount of damages; where the law furnishes no precise legal measure for the recovery of damages, the amount to be awarded is largely discretionary. *Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 710 (Tex.App.—Houston [1st Dist.] 1988, writ denied). We are not permitted to disregard the jury's answers to the issues merely because the jury's reasoning may be unclear to us. *Id.* We overrule Miller's ninth through twelfth points of error and Kendall's first and second cross-points.

■ In points of error 13 through 15, Miller complains of the third jury question, which asked whether he had been "unjustly enriched at Kendall's expense by obtaining for himself more shares of UPI stock for his interest in the Stratus computer lease than Kendall received for his interest...." The jury was instructed to answer question three only if it found, in response to question two, that Kendall should have received more than 12,250 shares.

Miller's thirteenth point of error, which complains that "the question essentially in-

structed the jury in the form it was submitted to answer the question in favor of Kendall," was not raised at trial. Point of error 13 is overruled. Tex.R.Civ.P. 274.

Miller's fourteenth and fifteenth points of error reiterate his argument that the evidence conclusively established that Miler and Kendall received equal shares for the Stratus lease. Therefore, he urges, question three should not have been submitted, and there is no evidence that supports the jury's finding that Miller was unjustly enriched. We have previously rejected Miller's argument, under his sixth and eighth points, that the Directors' Consent was insufficient evidence of its recitals. Accordingly, we overrule points 14 and 15.

■ Miller's next complaints concern jury question five, which asked: "Find the value, if any, of one share of the ITI–Delaware stock that C.F. Kendall or C.F. Kendall's partnership interest in K and M should have received, if any."

Miller objected at trial that the submission of question five was not supported by evidence. He also made this objection:

The correct measure of damages would be to put the parties in the position that they would have been had there have occurred no illegal conduct, and damages always seize at the time of the conduct. In this case the conduct occurred either in October or December or January '85 —'85, '86, and not at any other time, and, therefore, not to instruct the jury that they must limit their answer to that time period is an incorrect measure of damages.

Miller also requested a jury issue limiting the jury's inquiry to that period. The trial court refused his request.

Miller's points of error 16 through 20 revolve around his complaint that the trial court did not instruct the jury to find the stock value "at any particular time." In support of his position, he cites several decisions stating that the measure of damages for the conversion of stock is limited to the value of the stock at conversion. E.g., Patterson v. Wizowaty, 505 S.W.2d 425 (Tex.Civ.App.—Houston [14th Dist.] 1974, no writ); City Nat'l Bank v. Kiel, 348 S.W.2d 260 (Tex.Civ.App.—Fort Worth 1961, writ ref'd n.r.e.). Kendall counters that his suit was not for conversion but for Miller's breach of fiduciary duty. Kendall maintains that in such cases the breaching fiduciary is barred from reaping a benefit from his wrongdoing, and is therefore liable for the value of the stock at the time of trial. D. Sullivan & Co. v. Ramsey, 155 S.W. 580, 587 (Tex.Civ.App.—San Antonio 1913, no writ).

■ Even if Kendall's damages were properly measured under a conversion theory, Miller waived any error in the court's submission of question three. In ordinary conversion cases, the measure of damages is the value of the converted property at the time of the conversion, but where the conversion is attended with fraud, willful wrong, or gross negligence, and the property converted is of changing or fluctuating value, the measure of damages is the highest market value between the conversion and the filing of the suit. Ligon v. E.F. Hutton & Co., 428 S.W.2d 434 (Tex.Civ. App.—Dallas 1968, writ ref'd n.r.e.); see also Patterson, 505 S.W.2d at 427 (citing Ligon); Annotation, Measure of Damages for Conversion of Corporate Stock or Certificate, 31 A.L.R.3d 1286, 1314–16 (1970) (noting Ligon and recognizing rule that value may be measured at time of trial if plaintiff diligently prosecutes suit).

Miller failed to request a substantially correct instruction stating the proper measure of damages for conversion. He therefore waived any right to a reversal on that basis. Tex.R.Civ.P. 278. Points of error 16, 17, 18, and 19, which attack the form of question five, are therefore waived. Point of error 20 asserts that the evidence conclusively established that the stock had no value when converted. Kendall submitted evidence, however, that the stock had fluctuated in value between $5\frac{3}{8}$ and $14 in the year preceding trial. This evidence supported the jury's award.

We overrule points of error 16 through 20.

■ In point 22, Miller contends that the trial court erred in denying his motion

to transfer venue to Dallas County. In his motion, Miller contended that Kendall's alleged cause of action did not accrue in any part in Harris County. Miller is a Dallas County resident. Kendall does not argue that Dallas County was not a proper venue for this lawsuit, and Miller does not argue that Dallas County was a mandatory venue. Our focus, therefore, is on whether Harris County was also a proper venue. If it was, the trial court did not err in denying Miller's motion to transfer. *See* TEX.R. CIV.P. 87(2)(a) (plaintiff has burden of proving that venue is maintainable in the county of suit).

The general venue rule states, in part, that "all lawsuits shall be brought in the county in which all or part of the cause of action accrued...." TEX.CIV.PRAC. & REM. CODE ANN. § 15.001 (Vernon 1986). Kendall argues that part of his cause of action for Miller's alleged breach of fiduciary duty accrued in Harris County.

■ In reviewing the trial court's venue ruling, we consider the entire record, including the trial on the merits, to determine whether venue was proper in Harris County. TEX.CIV.PRAC. & REM.CODE ANN. § 15.064(a) (Vernon 1986). If venue was improper we must reverse. *Id.* Every reasonable intendment must be resolved in favor of the trial court's decision. *Royal v. Moore*, 580 S.W.2d 159, 161 (Tex.Civ.App. —Houston [1st Dist.] 1979, no writ).

■ Kendall alleged that "Miller assured Kendall, with actual awareness of the falsity of his assurances, that Kendall would receive stock certificates representing 50% of the consideration for the sale of the computer." Kendall testified that he and Miller finalized their agreement to lease the computer for equal shares in UPI in Harris County. His affidavit opposing Miller's motion to transfer venue stated that Miller telephoned him in Houston and discussed the details of the computer transaction. Venue may be sustained when actionable communications are made by telephone calls to the county of suit. *See, e.g., Harshberger v. Reliable–Aire, Inc.*, 619 S.W.2d 478, 481 (Tex.Civ.App.—Corpus Christi 1981, writ dism'd) (tortious interfer-

ence with prospective business relations); *First State Bank v. Von Boeckmann– Jones Co.*, 359 S.W.2d 171, 176 (Tex.Civ. App.—Austin 1962, no writ) (fraud).

■ Neither party cites Texas authority addressing the question of where a cause of action for breach of a fiduciary duty accrues, and our own research has revealed none. For venue purposes, a cause of action consists of the factual propositions that establish the plaintiff's "primary right," i.e., the defendant's duty, and the defendant's act or omission that violates such right. 1 R. McDonald, *Texas Civil Practice in District and County Courts,* § 4.30.2 (rev. 1981).

In the present case, Kendall's cause of action consisted, in part, of Miller's representations that he and Kendall would equally share the consideration received for the computer. Kendall's testimony that those representations were made in Harris County helped establish Miller's duty to him, and therefore supported the trial court's finding that venue was proper there. Point of error 22 is overruled.

■ In points 23 and 24, Miller complains that the trial court denied his motion challenging Kendall's lawyers' authority to act on the K & M Partnership's behalf. *See* TEX.R.CIV.P. 12. Miller's motion stated that he was a 50% partner in K & M and did not assent to the bringing of an action by K & M against himself. On appeal, Miller concedes that no jury questions were tendered on the partnership's behalf and that the judgment is silent regarding K & M. Nevertheless, he contends that the trial court improperly permitted K & M "to be perceived by the jury as having a legitimate claim against one of the partners. This prejudiced [him] immensely in the course of the trial and likely led to an erroneous verdict." Miller does not identify any testimony or documentary evidence that caused such prejudice.

The record does not contain a signed order denying Miller's motion to show authority, although the trial court's docket sheet contains the following handwritten notation: "3–3–89 mo/show authority de-

nied subject to affidavit by Tuesday next...." Miller contends this docket entry satisfies his obligation to obtain a ruling on his motion. Tex.R.App.P. 52(a).

■ Generally, a docket entry forms no part of the record we may consider; it is a memorandum made for the trial court and clerk's convenience. *Energo Int'l Corp. v. Modern Indus. Heating*, 722 S.W.2d 149, 151 (Tex.App.—Dallas 1986, no writ); *Restelle v. Williford*, 364 S.W.2d 444, 445 (Tex. Civ.App.—Beaumont 1963, writ ref'd n.r. e.). This rule results, in part, from the inherent unreliability of docket entries. *Energo*, 722 S.W.2d at 151 n. 2.

The docket notation relied on by Miller does not constitute a ruling that we may review. The docket entry's unreliability is illustrated by the record on appeal, which contains Kendall's brief in opposition to Miller's motion to show authority. That brief was filed April 3, 1989, one month after the docket entry relied on by Miller. The filing date contradicts Miller's contention that his motion was denied on March 3.

Furthermore, the notation refers to an unspecified affidavit to be filed by an unspecified party. We have no way of determining what the relevance of that affidavit was or whether it was filed. If it was not filed, Miller has not shown that he sought further relief consistent with the docket notation. We cannot sustain Miller's point of error on such a scant record. By failing to comply with rule 52(a)'s requirement that he obtain a ruling on his motion to show authority, Miller has waived any right to review. We overrule points 23 and 24.

■ Miller's final two points of error relate to the jury's findings on punitive damages. In response to the sixth jury question, the jury found that Miller's conduct in the issuance of stock to Kendall was committed "willfully, wantonly, or maliciously." The trial court instructed the jury that "an act is done willfully if done voluntarily and with the specific intent to commit such act."

The evidence was factually and legally sufficient to support the jury's finding that Miller acted willfully. Testimony from Kendall and Bruce Turbow, as recounted above, established that Miller promised Kendall an equal share of UPI stock for the Stratus computer, and that Miller made the final decision regarding the distribution of stock. From this testimony, the jury was entitled to infer that Miller specifically intended to take a disproportionate share of UPI stock. Point of error 25 is overruled.

In response to question seven, the jury awarded Kendall $1.00 in punitive damages. Miller's contention that the punitive damage was improper is based entirely on the proposition that the actual damage award should be reversed. Because we have sustained the actual damage award, we reject this contention. Point of error 26 is overruled.

■ In an additional cross-point of error, Kendall complains that the trial court refused his request for prejudgment interest on the jury's damage award. Kendall's argument on appeal is based on his reading of Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, § 6(a) (Vernon 1988), which states, in part: "Judgments in wrongful death, personal injury, and property damage cases must include prejudgment interest...." Kendall contends that he suffered property damage as a result of Miller's acts. He cites no authority for his argument that his economic loss is "property damage" within the meaning of the article 5069–1.05. Miller, who also fails to cite any relevant cases, argues that Kendall's judgment was not for property damage.

Article 5069–1.05, section 6 was passed as part of the Texas Legislature's 1987 tort reform package; one commentator suggests that section 6 is a modified version of the prejudgment interest rule created by the Texas Supreme Court in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985) ("equitable" prejudgment interest available in personal injury cases). Smith, *Prejudgment Interest on Contracts: The Forgotten Constitutional Dimension*, 26 Houston Lawyer 20, 22 (1989). The scope of section 6 is an open question. *Id.* at 25 n. 23; *see, e.g., Security Sav. Ass'n v. Clifton*, 755 S.W.2d 925, 935 (Tex. App.—Dallas 1988, no writ) (court of ap-

peals expresses "no opinion" about the applicability of section 6 to conversion cases).

In its memorandum and opinion, the trial court concluded that Kendall's case did not fall within article 5069–1.05, but was governed by the equitable principles established by *Cavnar*. The trial court concluded that an award of prejudgment interest to Kendall would be inequitable under *Cavnar*, because the value of Kendall's stock had appreciated so greatly after the time of injury that the jury's award compensated him for the lost use of his money. *Cf. Cavnar*, 696 S.W.2d at 552 n. 1 (prejudgment interest is based on "elemental equitable principle" that a defendant should pay for the plaintiff's lost use of money). The trial court based its decision that Kendall was not entitled to prejudgment interest on its conclusion that it "would be unfair to provide the plaintiff a windfall by allowing both appreciation from the date of the injury and prejudgment interest."

On appeal, Kendall challenges only the trial court's conclusion that his suit was not for property damage. He cites no reference in the record where he made this argument in the trial court. In a trial brief he filed in support of his proposed judgment, he asked for prejudgment interest under *Cavnar*, without citing article 5069–1.05, section 6. A complaint regarding the failure to award prejudgment interest must be preserved in the trial court by a motion to amend or correct the judgment or by a motion for new trial. *See Allright, Inc. v. Pearson*, 735 S.W.2d 240 (Tex.1987) (error regarding award of prejudgment interest must be preserved); *WLR, Inc. v. Borders*, 690 S.W.2d 663, 668–69 (Tex.App.—Waco 1985, writ ref'd n.r.e.) (stating proper vehicle for preserving error in judgment). Because Kendall failed to state the specific grounds he now relies on to support his claim for prejudgment interest, any error was waived. Tex.R.App.P. 52(a).

Kendall's third cross-point is overruled, and the judgment of the trial court is affirmed.